## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JONES PLANTING CO. III, on behalf of itself and all others similarly situated<br><br>*Plaintiff,*<br><br>v.<br><br>BAYER CROPSCIENCE LP, BAYER CROPSCIENCE, INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK INC., SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,<br><br>*Defendants.* | Civil Action No.<br><br>**Class Action Complaint**<br><br>**Jury Trial Demanded** |

Plaintiff Jones Planting Co. III, on behalf of itself and all others similarly situated, files this complaint against Defendants for their violations of federal antitrust laws from at least January 1, 2014, through the date on which the effects of Defendants' unlawful conduct cease ("Class Period"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel.

## I.   NATURE OF THE CASE

1.   The market for "Crop Inputs"—seeds and crop protection chemicals such as fungicides, herbicides, and insecticides manufactured by Manufacturer Defendants—used by American farmers is one of the largest markets in the world with annual sales in excess of $65 billion.

2.   This market is dominated by four major manufacturers—Bayer CropScience Inc. and Bayer CropScience LP., Corteva Inc., Syngenta Corporation, and BASF Corporation—all of which are named as Defendants here (collectively, the "Manufacturer Defendants"). The Manufacturer Defendants' products reach the market through large wholesalers—Defendants Cargill Incorporated, Winfield Solutions, LLC, Univar Solutions, Inc. (the "Wholesaler Defendants")—that control the distribution of Crop Inputs to farmers as well as retailers, including Defendants CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Simplot AB Retail Sub, Inc., Tenkoz Inc., and Federated Co-operatives Limited (the "Retailer Defendants").

3.   The existing distribution process maintains supracompetitive Crop Input prices by denying farmers accurate product information, including pricing information, which would allow them to make better-informed purchasing decisions. As a result, the average price American farmers pay for Crop Inputs is increasing at a rate that dramatically outpaces yields. For

example, over the last 20 years, the price of seed corn rose 300%, while corn yields increased only 33% to 35%. This disparity is proving increasingly devastating to farmers, who are now the least profitable level of the American food supply chain. Indeed, many farmers are drowning in hundreds of billions of dollars of operating debt that is forcing them into bankruptcy at a record pace.

4.      Additionally the Crop Input market is structured to maximize opacity. Farmers lack the objective information and data needed to gauge whether their investments are worthwhile, as well as any ability to purchase Crop Inputs without paying unnecessary overhead to brick-and-mortar retailers. Recognizing the inefficiency in the distribution model, several electronic Crop Input sales platforms launched between 2016 and 2017. These platforms aimed to provide a cheaper, more transparent way for farmers to buy Crop Inputs by selling products acquired from the Manufacturer Defendants directly to farmers, circumventing the opaque, convoluted distribution system. For example, Farmers Business Network ("FBN") and AgVend Inc., two leading electronic sales platforms, were extremely popular with farmers upon launch, and both successfully raised millions of dollars from leading venture capital firms to build out capacity to meet that demand. FBN is one of the best-funded platforms, having raised approximately $571 million, including $250 million in August 2020.

5.      These new platforms threatened Defendants' dominant market position and control over Crop Input pricing. As a result, rather than compete fairly with these new electronic platforms, Defendants conspired to block the platforms' access to Crop Inputs by engaging in a group boycott. The Manufacturer and Wholesaler Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing amongst themselves not to sell Crop Inputs to FBN, even though doing so would have opened a significant new sales channel for any individual wholesaler or

manufacturer acting independently and in its unilateral best economic interest. To ensure that this boycott was successful, Manufacturers imposed strict penalties on retailers who made sales to FBN. Similarly, certain manufacturers audited authorized retailers to ensure that electronic platforms were not securing branded Crop Inputs by buying from an authorized retailer.

6.     When FBN attempted to circumvent this unlawful boycott by purchasing an established retailer with existing supply agreements, the Manufacturer Defendants canceled their contracts with that retailer, starving FBN's platform of necessary Crop Inputs. Other platforms, including AgVend, faced a similar fate, as Defendants also refused to supply them with Crop Inputs.

7.     In early 2020, it was revealed that Canada's Competition Bureau ("CCB") has been investigating this conduct. According to documents filed by CCB, it is understood that Defendants refused to supply or restricted supply of Crop Inputs to FBN and engaged in coordinated behavior in relation to FBN. The United States Department of Justice is reportedly monitoring CCB's investigation.

8.      As a result of Defendants' misconduct, farmers remain trapped in an inefficient, opaque Crop Input market that eliminates their profits and destroys their livelihoods. Plaintiff and the Class bring this antitrust suit to redress that misconduct and ensure that future generations of farmers do not suffer the same fate.

## II.     JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a)..

10.     Venue is appropriate within this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (venue for antitrust matters brought under the federal antitrust laws), or 28 U.S.C.

3

§1391(b) (federal venue statute). One or more Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

## III.   PARTIES

### A.   Plaintiff

11.   Plaintiff Jones Planting Co. III is a Mississippi company located at 306 S Main St Yazoo City, MS. Plaintiff purchased Crop Inputs manufactured by one or more Defendants for its own use , including, for instance, Roundup PowerMAX® II and Engenia®, directly from one or more Defendants, including, Simplot AB Retail Sub, Inc., at supracompetitive prices during the relevant time period.

### B.   The Manufacturer Defendants

12.   Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

13.   Defendant Bayer CropScience Inc. is a wholly-owned subsidiary of Bayer AG, headquartered in St. Louis, Missouri and incorporated in New York, that develops, manufactures, and sells Crop Inputs, including agricultural chemicals, in the United States.

14.   Defendant Bayer CropScience LP is a wholly-owned subsidiary of Bayer AG, headquartered in Research Triangle Park, North Carolina and incorporated in Delaware, and is a crop science company that sells Crop Inputs, both seeds and crop protection products, in the United States.

15.   Bayer CropScience Inc. and Bayer CropScience LP (together, "Bayer") both operate as part of the Bayer Group's Crop Science division.

4

16.     Defendant Corteva Inc. is a domestic corporation headquartered and incorporated in Delaware that develops, manufactures, and sells Crop Inputs in the United States. Approximately 55% of Corteva's revenues are derived from seeds with the remainder coming from various crop protection products. Corteva Inc. was formed as a result of the spin-off of DowDuPont, Inc.'s agriculture business on June 1, 2019.

17.     Defendant BASF Corporation is headquartered in Florham Park, New Jersey and incorporated in Delaware. It is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

18.     Defendant Syngenta Corporation is the main U.S.-based operating subsidiary of Syngenta AG and is headquartered and incorporated in Delaware. Syngenta develops, manufactures, and sells Crop Inputs, both seeds and crop protection products, in the United States.

### C.     The Wholesaler Defendants

19.     Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota and incorporated in Delaware. It owns and operates wholesaler AgResource Division which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta, authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

20.     Defendant Winfield Solutions, LLC ("Winfield United") is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware. Winfield United is a Crop Input wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield United is also a major Crop Input retailer that operates as a cooperative

5

owned by its members, which are 650 Crop Input retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

21.     Defendant Univar Solutions, Inc. ("Univar") is a Crop Input wholesaler. Univar is a domestic corporation headquartered in Illinois and incorporated in Delaware. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

**D.     The Retailer Defendants**

22.     Defendant CHS Inc. is incorporated and headquartered in Minnesota. CHS is one of the largest crop input wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick and mortar stores. CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

23.     Defendant Nutrien Ag Solutions, Inc. ("Nutrien") is incorporated in Delaware and has its principal place of business in Colorado. Nutrien is both a Crop Input wholesaler and the largest Crop Input retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

24.     Defendant GROWMARK, Inc. d/b/a Farm Supply or FS, is a large Crop Input retailer headquartered in Illinois and incorporated in Delaware. GROWMARK has brick and mortar locations throughout the midwestern United States. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

6

25.     Defendant Tenkoz Inc. is incorporated and headquartered in Georgia. Tenkoz is one of the largest Crop Input retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

26.     Defendant Simplot AB Retail Sub, Inc., f/k/a Pinnacle Agriculture Distribution, Inc., ("Simplot") is incorporated in Mississippi and headquartered in Idaho. Simplot is a large Crop Input wholesaler and retailer that operates 135 retail locations across 27 states. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

27.     Defendant Federated Co-operatives Ltd. ("Federated") is a large Crop Input retailer. Federated is headquartered in and incorporated in Saskatchewan, Canada. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the market for Crop Input.

IV.     SUBSTANTIVE ALLEGATIONS

28.     Farmers in the United States are facing an existential crisis, with operating expenses skyrocketing while yields remain stagnant. This is the case across the entire Crop Input—the seeds and chemicals such as fertilizer, insecticide, and herbicide used to produce a crop—market. Seed costs have more than tripled over the past two decades; chemical and fertilizer products have also faced significant cost increases. Since 1996, total production costs of

7

corn, one of the most planted field crops in the United States, has nearly doubled, as depicted in Figure 1:

**Figure 1**[1]



29.     With these rising costs, farmers are not able pay their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

30.     This steady cost increase is attributable to two factors: (1) the massive, unjustifiable disparities in the prices that different farmers pay for Crop Inputs and (2) the supracompetitive prices paid by farmers as a result of Defendants' group boycott of electronic

---

[1] FBN, *The Future of the Family Farm* (2020).

distribution platforms. Notably, research and development expenditures for farmers have actually *decreased* considerably over the past several years.

A.      **Price Disparities and Market Opacity**

31.     With regard to the price disparities, prices for a single product can vary greatly within a single geographic region. By way of example, a 2019 report showed that there was a *141% difference* in Illinois between the lowest and highest reported price per gallon for Bayer AG's popular herbicide Roundup PowerMAX®. The report also showed that major price disparities existed in several other states. Figure 2 below depicts the price disparities in the Midwest:

**Figure 2**[2]



[2] Brian Paff, "How Much Are Farmers In Your State Paying For Ag Chemicals?" Emergence by FBN (Feb. 14, 2020), *available at* https://emergence.fbn.com/inputs/in-state-price-variation-ag-chemicals.

32.     These price disparities persist—and wreak financial havoc on America's farmers—by Defendants' design. The Crop Input market is structured, from top to bottom, to maximize opacity and deny farmers access to the objective pricing data and product information they need to make informed decisions about the Crop Inputs they buy. Farmers, through no fault of their own, are unwittingly paying more for Crop Inputs than they would in a truly competitive market. Farmers lack the objective information and data needed to gauge whether their investments are worthwhile, as well as any ability to purchase Crop Inputs without paying unnecessary overhead to brick-and-mortar retailers.

33.     This opacity begins at the very top of the Crop Input market, where the Manufacturer Defendants who develop and produce between 75% and 90% of the most popular Crop Inputs closely guard their product prices.

34.     Then, to maintain that secrecy, Manufacturer Defendants allow only certain companies licensed as "authorized retailers" to sell their Crop Inputs—*i.e.*, wholesalers, including the Wholesaler Defendants, the retailers owned or operated by the Manufacturer Defendants, and retailers such as the Retailer Defendants.

35.     The contracts granting "authorized retailer" licenses contain strict confidentiality provisions that require authorized retailers to keep confidential the manufacturers' prices, as well as any incentives, rebates, and commissions offered by the manufacturers to their authorized retailers. Those contracts also require so-called "zone pricing," under which identical products are sold at different prices depending on a farmer's location, which must also be kept strictly confidential. Zone pricing reflects historical practice (first introduced by Defendant Bayer in the 1990s) rather than any legitimate justifications for disparate pricing.

36.     Manufacturers also use a tactic known as "seed relabeling" to capitalize on farmers' lack of objective performance data. Seed relabeling is the practice of taking seeds that have been on the market under a given brand name for some time and repackaging the seeds under a new brand name so that they can be sold at a new, higher price, even though the seeds are the same.

37.     Pricing is no more transparent at the retail level. To the contrary, wholesalers' contracts with authorized retailers also contain strict confidentiality provisions. Retailers cannot disclose the price paid to the wholesaler for its Crop Inputs or the price at which retailers sell those Crop Inputs to other farmers. To further muddy the market waters, retailers sell Crop Inputs and related services (*e.g.*, spraying or applying chemicals) in bundles, making it difficult—if not impossible—for farmers to discern the price they are being charged for any individual Crop Input or service.

**B.     Electronic Sales Platforms and the Group Boycott**

**1.     Electronic Sales Platforms**

38.     Recognizing the inefficiency of such an opaque Crop Input market, electronic Crop Input sales platforms began emerging by 2016 with the goal of modernizing the market by, among other things, providing farmers with transparent pricing and access to Crop Inputs direct from the Manufacturer Defendants, avoiding the opaque distribution system controlled by the Wholesaler and Retailer Defendants. On FBN, for example, users (*e.g.*, farmers) can agree to disclose their crop-related data which grants them access to a variety of data-related services, including digital agronomic advice on seed selection and yield benchmarking as well as a pricing comparison tool that permits users to receive aggregated information on what other users are paying for Crop Inputs.

11

39.     At first, those efforts showed extraordinary promise, as farmers gravitated toward these electronic platforms in search of better, fairer prices for Crop Inputs. For example, more than 12,000 farmers signed up for FBN's service that provides objective performance data on Crop Inputs, while 6,000 farmers signed up for FBN's electronic platform that was designed to sell Crop Inputs online.

**Figure 3**[3]



FBN membership*

*Includes members in the U.S., Canada and Australia
Note: 2020 figure is an estimate for the end of September.
Source: Farmers Business Network

40.     Farmers were attracted to these platforms both for their ease and because prices on the platform were significantly lower than in the traditional distribution chain. For instance, on FBN's online store, FBN Direct, prices on a number of Crop Inputs were generally 15% percent below the market average in 2020.

---

[3] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms Runs Into AG Giants," Wall Street Journal (Aug. 30, 2020), *available at* https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.

**Figure 4**[4]



41.    This success drew negative attention from Defendant Wholesalers and Retailers, who recognized that these new entrants threatened their traditional role in the Crop Input market and, more importantly, threatened their profit margins. As a report from CoBank, a cooperative partly owned by Crop Input retailers and a major lender to grain cooperatives, explained, "Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices."[5] That price transparency would provide the information necessary to farmers to allow them to negotiate with sellers of Crop Inputs, thus eating into their margins.

---

[4] FBN, *The Future of the Family Farm* (2020).
[5] Matt Hopkins, "Ag Retailers Look to Retool Strategy for Success in the Era of E-Commerce," CropLife (Feb. 21, 2019), *available at* https://www.croplife.com/management/ag-retailers-look-to-retool-strategy-for-success-in-the-era-of-e-commerce/.

13

2.     **The Boycott**

42.     Various participants in the Crop Input market were concerned about what FBN's market entry could do to their businesses.

43.     Upon learning about FBN's entry into the market in 2016, Defendant CHS, a wholesaler and retailer, distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that, while an electronic platform like FBN would be able to offer the same products at cheaper prices, "FBN just does it . . . without returning any profits to you the [producer], while lining the pockets of [investors] and big data companies like Google."[6]

44.     Bayer, for its part, secretly formed an internal task force in 2016 specifically to study the long-term competitive impact of FBN's electronic platform.

45.     Additionally, CropLife America, a large trade association whose members are major Crop Input manufacturers, wholesalers, and retailers, also got involved in trying to prevent FBN from upsetting the lucrative apple cart that its members were desperate to protect.

46.     CropLife America is led by, and beholden to, Defendants. Its Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea, and previously Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. Although CropLife America's long-time CEO claims that "the work of our Board of Directors is imperative to making sure that farmers have access to crop protection technology today and in the future," there is not a single representative from farming groups on CropLife America's Board of Directors. Instead, the Board of Directors comprises exclusively

---

[6] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms Runs Into AG Giants," Wall Street Journal (Aug. 30, 2020), *available at* https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.

representatives from large Crop Input manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

47.     CropLife America also publishes CropLife Magazine which echoed CoBank's sentiments and wrote repeatedly about the danger electronic platforms posed to Crop Input retailers' business model. In 2016, CropLife specifically acknowledged the price and convenience benefit of an online platform and stated that it was "concerned that the retailer could be disintermediated—a fancier and less draconian way of saying 'cut out the middle man'— allowing growers to find product conveniently and at a lower market price." And in 2017, CropLife decried "the devil known as 'price transparency,'" commenting that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."[7]

48.     CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—also clearly identified the threat posed by electronic platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council

---

[7] Paul Schrimpf, "Crop Input Selling: Return Of The Price List," CropLife (Feb. 2, 2016), *available at* https://www.croplife.com/editorial/paul-schrimpf/crop-input-selling-return-of-the-price-list/.

described how FBN had negatively affected their businesses during 2017 by cutting into their already slim margins on various products."[8]

49.     The Retailer Defendants and the Wholesaler Defendants knew that retention of their market positions and profit margins depended on the exclusion of electronic platforms from the market, so they conspired to cut off the platforms' product supply. To achieve this end, the Retailer and Wholesaler Defendants pressured the Manufacturer Defendants, which rely on the Retailer and Wholesaler Defendants to recommend and sell their products to farmers, to refuse to supply FBN.

50.     The Manufacturer Defendants complied with this demand and initiated a joint boycott of electronic platforms including FBN, the target of CropLife's report. As a result, when FBN reached out to the Manufacturer and Wholesaler Defendants for Crop Inputs, they all refused to supply FBN, offering only pretextual excuses for doing so. For example, Syngenta's Head of Crop Protection Sales in the United States falsely claimed that electronic platforms would deliver counterfeit products and that, "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."[9]

51.     To ensure that this boycott was successful, Defendants imposed strict penalties on retailers who failed to fall in line. For example, in 2018, after learning that some retailers had sold product to FBN despite the boycott, Syngenta initiated an audit of its authorized retailers to identify and punish the retailers who had made those sales.

---

[8] Eric Sfiligoj, "Farmers Business Network: 'Crazy, Stupid' . . . to Ignore," CropLife (Nov. 6, 2017), *available at* https://www.croplife.com/editorial/farmers-business-network-crazy-stupid-ignore/.
[9] Chris Bennett, "Ag Retail Scrambles for Online Sales," The Scoop (Dec. 10, 2018), *available at* https://www.thedailyscoop.com/news/retail-business-news/new-products/ag-retail-scrambles-online-sales.

52.     Bayer, BASF, and Corteva similarly include mandatory language in their form contracts with authorized retailers allowing them to audit those retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to ensure that electronic platforms could not secure branded Crop Inputs by buying from an authorized retailer.

53.     This backlash even extended to generic products (*i.e.*, Crop Inputs that no longer retain patent protection). In a recent Forbes article, one CEO of a generic chemical products company stated that his company was waiting to supply to FBN because it was "wary of angering their existing sales channels [*i.e.*, wholesalers and retailers]." That CEO confirmed, "In an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."[10]

54.     FBN attempted to neutralize this boycott by purchasing Yorkton, a Canada-based retailer with decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield United. These agreements—if honored—would have provided FBN with Crop Input inventory to sell to American farmers. Instead, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they continued supplying Crop Inputs to Yorkton. Faced with these threats, the Manufacturer Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within a few months of its March 2018 acquisition by FBN.

55.     This boycott was successful. FBN, starved of Crop Inputs, has had to pivot away from the business model it launched with. Today, rather than selling known and established Crop

---

[10] Amy Feldman, "This Scrappy Startup Wants To Save Family Farms. But Big Ag Is Fighting Back," Forbes (June 30, 2018), *available at* https://www.forbes.com/sites/amyfeldman/2018/06/19/farming-ag-agriculture-farmers-business-network/?sh=1d8906e96312.

Inputs to farmers in a transparent way at competitive prices, FBN has been forced to develop its own generic products and sell them under a private label.

56.     Defendants' boycott was not limited to FBN. They also refused to supply AgVend. Lacking supply, AgVend shut down its platform altogether in favor of establishing web-based storefronts for traditional brick-and-mortar retailers, essentially migrating the existing broken market structure online.

57.     As a result of the Retailer, Wholesaler, and Manufacturer Defendants' coordinated actions, farmers were deprived of the opportunity to purchase Crop Inputs at transparent, lower prices from electronic platforms. Instead, they were forced to continue paying artificially high prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements.

### 3.     Canadian Competition Bureau Investigation

58.     The downfall of FBN and AgVend drew the attention CCB, which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets. The CCB is investigating whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada. In its investigation, CCB is probing allegations that Defendants refused to supply or restricted supply to FBN and whether Defendants engaged in coordinated conduct against FBN.

59.     In the course of that investigation, on February 11, 2020, a Canadian federal court granted in full *ex part*e applications made by Canada's Commissioner of Competition for the production of records against manufacturers and wholesalers, including Cargill Limited,

Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., and Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC, relating to those practices.

60.     Critically, and over Defendants' objections, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well. The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs.

61.     In January 2021, CCB filed an application seeking an order requiring three Bayer CropScience employees to be examined under oath or solemn affirmation by the Commissioner of Competition.

### 4.     Antitrust Plus Factors Render the Conspiracy Economically Plausible.

62.     Defendants' actions were not mere parallel conduct but took place in the context of multiple plus factors that typically evince a conspiratorial agreement.

63.     First, the conspiracy was feasible because the market for Crop Inputs is highly concentrated and has been for years. BASF, Corteva Inc., Syngenta Corporation, and Bayer AG dominate production in virtually every Crop Input category because they hold the patents for the genetic traits and crop protection chemicals that work best with popular branded seeds. As a result, these entrenched companies control 85% of the corn seed market, more than 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

64.     Second, such an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation between Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan; otherwise, any Manufacturer Defendant

that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

65.     Third, Defendants had a strong motive to conspire to preserve the present, opaque market structure. If electronic platforms published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep prices confidential and charge widely varying prices for the same Crop Input based on geography and/or maintain price opacity through seed relabeling and bundling. The Retailer Defendants and Wholesaler Defendants were therefore motivated to conspire amongst themselves and exert pressure on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

66.     Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers. Multiple industry meetings throughout the year provided ample opportunities for Defendants to conspire.

67.     For example, CropLife holds multiple meetings each year that bring Defendants together. For one, CropLife's Board of Directors is composed of Defendants' executives, currently including Liam Condon (Bayer), James Collins (Corteva), Erik Frywald (Syngenta), and Vincent Gros (BASF). The board meets annually to discuss developments in the Crop Input market and has specifically discussed the entry of electronic platforms. Because no representatives from farmers are allowed to participate, these meetings provided a forum for collusion amongst the manufacturers. Additionally, as noted above, CropLife's PACE Advisory Council—which, again, is composed of the "heads of major ag retailers, market suppliers,

equipment makers, and other agricultural analysts"—meets annually to discuss issues affecting the Crop Input market.

68.     The Agricultural Retailers Association ("ARA"), which specifically touts that it "offers programs and services designed to keep agricultural retailers on top of critical issues that impact profitability,"[11] also hosts an annual in-person industry conference, which is attended by representatives from all major Crop Input retailers, as well as representatives from each Defendant. Multiple executives from the Defendants currently serve on the ARA Board, including Rod Wells, the current Board Chairman and the Chief Supply Chain Officer of Defendant GROWMARK. Notably, every single one of the Manufacturer Defendants was a "Platinum Sponsor"—the highest level sponsorship—at the 2019 annual conference (held in December 2019, shortly before such conferences were suspended due to COVID-19).

69.     These industry conferences provided ample opportunity for Defendants to not only agree amongst themselves how to block electronic platforms from emerging but also to coordinate with the other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

70.     Fifth, Defendants' actions were against their apparent individual economic self-interest. Providing Crop Inputs to electronic platforms presented a significant business opportunity because those platforms (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by

---

[11] https://www.aradc.org/about/about-ara#board.

growing its market share through sales to farmers nationwide, not merely in geographic areas in which its authorized retailers operated.

71.     Sixth, Defendants are antitrust recidivists, which is probative of future collusion. Competition experts have noted that past participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Notably, the organization Competition Policy International maintains a list of the "fifty-two leading recidivists," and both BASF and Bayer are among the *top five* leading antitrust recidivists. Corteva also made the list and is among the top forty leading antitrust recidivists.

## V.     TRADE AND COMMERCE

72.     Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

73.     During the Class Period, Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## VI.     THE RELEVANT MARKETS

74.     This action involves the markets for Crop Inputs, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

75.     The relevant geographic market is the United States.

## VII.     ANTITRUST IMPACT

76.     Defendants' conduct has substantially impaired competition in the retail sale market for Crop Inputs by excluding electronic platforms, including FBN and AgVend, from competing in that market.

77.     Defendants' conduct in boycotting and preventing electronic platforms from competing in the retail sales market for Crop Inputs lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury—suffered by farmers and

other consumers of Crop Inputs—more than offsets any procompetitive justifications Defendants may offer.

## VIII.   ANTITRUST INJURY

78.     Plaintiff and Class Members have suffered antitrust injury as a direct result of Defendants' unlawful conduct.

79.     By impairing competition in the retail sales market for Crop Inputs, and by excluding electronic platforms from competing in that market, Defendants have artificially raised the prices paid by farmers and other purchasers for Crop Inputs and ultimately the prices paid by consumers for farm products including corn and grain.

## IX.   STANDING TO SEEK RELIEF

80.     By engaging in the conspiracy alleged in this Complaint, the Manufacturer Defendants, Wholesaler Defendants, and Retailer Defendants have kept a market structure in place that benefits each of them at the expense of farmers. As the first purchasers injured by Defendants' anticompetitive conduct, Plaintiff and the members of the Class have standing as direct purchasers under Section 4(a) of the Clayton Act, 15 U.S.C. §15(a).

81.     The members of the Classes also have standing to seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, because the conspiracies have inflicted or threatened to inflict harm on them, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Classes as a whole.

## X.   PLAINTIFF'S CLAIMS ARE TIMELY

### A.     Equitable Tolling and Fraudulent Concealment

82.     Any applicable statute of limitations for Plaintiff and the Class has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' and their co-conspirators' concealment of the conspiracy.

23

83.     Plaintiff and the Class were not placed on notice of the conspiracy alleged herein until CCB made public its investigation and issued its subpoenas. More specifically, CCB's investigation made public allegations that Defendants refused to supply FBN with Crop Inputs and/or engaged in communications that are suggestive of coordinated behavior in relation to FBN. Group boycotts, such as the one disclosed by CCB, and other antitrust violations are inherently self-concealing, and Plaintiff and the Class could not have uncovered the conspiracy earlier using reasonable diligence.

84.     Moreover, Defendants have wrongfully and affirmatively concealed the existence of their anticompetitive scheme from Plaintiff and the public by, among other things, safeguarding a market structure designed to maximize opacity and utilizing strict confidentiality provisions in their distribution contracts.

85.     Plaintiff and the Class could not have uncovered Defendants' conspiracy through the exercise of reasonable diligence. For one, Plaintiff and the Class do not have visibility into Defendants' pricing nor their distribution contracts which contain significant pricing-related terms. Additionally, Plaintiffs and the Class are not members of the various boards and executive committees where the issues surrounding this complaint were discussed amongst the Defendants.

**B.      Continuing Violation**

86.     In addition, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods). Therefore, should the Court find that any applicable statute of limitations was not tolled due to Defendants' fraudulent concealment, Plaintiff and members of the Class are entitled to recover damages they suffered during the limitations period.

87.     A claim accrued for Plaintiff each time it purchased Crop Inputs at supracompetitive prices due to Defendants' group boycott and continuing anticompetitive scheme.

24

## XI.    CLASS ACTION ALLEGATIONS

88.    Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of

the Federal Rules of Civil Procedure, on behalf of:

> All persons or entities residing in the United States that, during the Class Period, purchased from a Defendant a Crop Input manufactured by a Manufacturer Defendant.

89.    The following persons and entities are excluded from the Class:

(a)    Defendants, their officers, directors, management, employees,

subsidiaries, affiliates, and coconspirators;

(b)    Any persons or entities that purchased Crop Inputs solely for resale to

others;

(c)    All governmental entities;

(d)    All Counsel of Record; and

(e)    The Court, Court personnel, and any member of their immediate families.

90.    Members of the Class are so numerous and geographically dispersed that joinder

is impracticable.

91.    Members of the Class are readily identifiable from information and records in

Defendants' possession.

92.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff

and members of the Class were damaged by the same wrongful conduct of Defendants.

93.    Plaintiff will fairly and adequately protect and represent the interests of members

of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of members of

the Class.

94.    Plaintiff is represented by counsel with experience in the prosecution and

leadership of class action antitrust and other complex litigation.

95.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to members of the Class as a whole appropriate. Questions of law and fact common to members of the Class include, but are not limited to:

(a)     whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

(b)     whether Defendants refused to supply FBN with Crop Inputs or otherwise restricted supply to FBN;

(c)     whether Defendants' conduct prevented FBN from selling and/or marketing branded Crop Inputs;

(d)     the duration of the alleged conspiracy;

(e)     whether Crop Input retailers conspired amongst themselves and/or joined the conspiracy to unreasonably restrain trade in violation of antitrust laws;

(f)     injury suffered by Plaintiff and members of the Class;

(g)     damages suffered by Plaintiff and members of the Class; and

(h)     whether Defendants have acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

96.     Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism,

26

including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

97.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

98.     Plaintiff has defined members of the Class based on currently available information and hereby reserves the right to amend the definition of members of the Class, including, without limitation, the Class Period.

### CLAIM FOR RELIEF

### COUNT 1

### Conspiracy to Restrain Trade in Violation of
### § 1 of the Sherman Act (15 U.S.C. § 1)

### (Against all Defendants)

99.     Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

100.    During the Class Period, Defendants entered into and engaged in a combination or conspiracy in restraint of trade to (1) artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs that Defendants sold to Plaintiff and members of the Class, and (2) jointly boycott entities that would have introduced price-reducing electronic purchasing of Crop Inputs in the United States.

101.    Defendants' actions were not mere parallel conduct but took place in the context of multiple plus factors that typically evince a conspiratorial agreement.

102.    Defendants' conduct is per se unlawful under federal antitrust law.

27

103.    Alternatively, this conspiracy violated Section 1 of the Sherman Antitrust Act under a "quick look" or rule of reason evaluation. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

104.    Plaintiff and members of the Class directly purchased Crop Inputs from one or more Defendants and their co-conspirators at supracompetitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

105.    Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15.

106.    Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26.

## XII.    DEMAND FOR RELIEF

107.    Accordingly, Plaintiff, on behalf of itself and the proposed Class, respectfully demands that the Court:

(a)    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as named representative;

(b)    Enter judgment against Defendants and in favor of Plaintiff and the Class;

(c)     Award damages (*i.e.*, three times overcharges) to the Class in an amount to be determined at trial, plus interest in accordance with law;

(d)     Enter injunctive relief to stop Defendants' unlawful conduct;

(e)     Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

(f)     Award such further and additional relief as is necessary to correct for the anticompetitive market effects Defendants' unlawful conduct caused and as the Court may deem just and proper under the circumstances.

## XIII.   JURY DEMAND

108.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Dated: February 11, 2021                        */s/ Charles F. Barrett*

Charles F. Barrett
**NEAL & HARWELL, PLC**
1201 Demonbreun Street
Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
cbarrett@nealharwell.com

Gregory S. Asciolla (*pro hac vice* forthcoming)
Karin E. Garvey (*pro hac vice* forthcoming)
Jonathan S. Crevier (*pro hac vice* forthcoming)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
gasciolla@labaton.com
kgarvey@labaton.com
jcrevier@labaton.com

29

Jonathan P. Barrett (*pro hac vice* forthcoming)
**BARRETT LAW, PLLC**
121 Colony Crossing, Suite D
Madison, MS 39110
Telephone:  601-790-1505
jpb@barrettlawms.com

*Attorneys for Plaintiff and the Proposed Class*